UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SUSAN GARDNER,

        Plaintiff,                         Case No. 15-cv-10269

v.                                                Honorable Thomas L. Ludington

ANDERSEN EYE ASSOCIATES, PLC,

        Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DISMISSING COUNT I OF PLAINTIFF'S COMPLAINT WITH PREJUDICE, AND DISMISSING COUNT II OF PLAINTIFF'S COMPLAINT WITHOUT PREJUDICE**

Plaintiff Susan Gardner initiated this case against Defendant Andersen Eye Associates, PLC, on January 22, 2015. *See* Compl., ECF No. 1. She claims that Andersen Eye retaliated against her in violation of the Family and Medical Leave Act ("FMLA") by not granting her extended leave and by terminating her employment. She also claims that Andersen Eye discriminated against her in violation of the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA") when it failed to accommodate her disability, denied her extended leave, and terminated her employment.

Andersen Eye has moved for summary judgment. It argues that Gardner cannot establish a prima facie case of FMLA retaliation or disability discrimination.

**I.**

Susan Gardner is a resident of the County of Saginaw, Michigan. She is a former employee of Andersen Eye Associates. Andersen Eye is a professional limited liability company

doing business in the County of Saginaw, Michigan. It is in the business of providing eye care services.

## A.

When Gardner was two years old, she suffered serious burns from hot water on both of her feet. She was hospitalized for two years following the injury during which time she had amputations and skin grafts performed on her feet. She has dealt with pain in her feet ever since.

Gardner began working for Andersen Eye in 1995. She first started working as a check-in receptionist. Eventually she performed a number of billing-related tasks for Andersen Eye. In 1997, she had to quit her position with Andersen Eye for surgery on her feet. She had portions of both feet amputated, removing a number of her metatarsals in both feet. During her two years away from work she was no longer employed by Andersen Eye.

In 1999, Gardner received a phone call from Deb Rogers, an employee of Andersen Eye, who asked Gardner if she would return to work. Gardner was initially hesitant but agreed to return to work for Andersen Eye in the same role as she had previously occupied: performing back-office billing functions. Because of her physical limitations, however, Gardner requested a personalized work schedule. As she explains it, she and Andersen Eye "set up a schedule of Monday, Wednesday, Thursday. Initially I was coming in from—I would get there around 4:30 or 5:00 a.m., and I would leave by 11:30 or noon." Gardner Dep. 18-19, Ex. 2, Def.'s Mot. Summ. J., ECF No. 16-3. To meet the full time employment requirement of working thirty-six hours per week, Gardner would work from home when she was not in the office. Gardner regularly worked forty hours per week.

**B.**

Gardner continued in this position and under this working arrangement until 2009 or 2010. Around 2010 her schedule changed. She continued to work on Monday, Wednesday, and Thursday but her hours shifted to 8:30 a.m. to 2:00 p.m. Under her flexible work-schedule, she had the ability to work from home whenever the pain in her feet flared up. During the time when Gardner was working on a reduced in-office schedule, discrepancies with her time card arose. Andersen Eye learned that Gardner often left herself clocked in when she was transitioning from working at home to working in the office or vice versa. Gardner was not supposed to count time in transit as work hours. According to Gardner, there were often glitches in the time card system, but she admits that she never reported these to Chief Executive Officer Kurt Beuthin. Gardner explained during her deposition that she also often worked in excess of forty hours per week. She never logged that time and made Andersen Eye aware of her overtime, however, because she was instructed just to hit her forty hour per week mark.

**C.**

When Andersen Eye became aware that Gardner was potentially misusing the timeclock and counting hours when she was in transit, it investigated her activities. It reviewed Gardner's time clock activity between January and May of 2014. According to Andersen Eye CEO Kurt Beuthin, "Gardner charged [Andersen Eye] for drive time forty-seven (47) to forty-nine (49) times during this review period . . . by not punching out at home and punching in when she arrived at [Andersen Eye]." Beuthin Aff. ¶ 3, Ex. 3, Def.'s Mot. Summ. J., ECF No. 16-4. Gardner's timecard practices convinced Beuthin that she could no longer work from home.

Mr. Beuthin conducted a review of Gardner's job duties following the investigation. Upon review, Beuthin contacted Andersen Eye's third-party billing provider, Automated

Business Systems ("ABS"). He learned from ABS that it could perform all of Gardner's functions at no additional cost to Andersen Eye. As a result, Mr. Beuthin made the decision to eliminate Gardner's position.

On May 15, 2014, Mr. Beuthin presented Gardner with a memo about her options now that her position had been eliminated. The memo read: "Options: • Resign . . . . . . . or • [Andersen Eye] position Monday, Tuesday Wednesday or Thursday, 4 days or Full Time Monday thru Friday (standard working hours and lunch)." Beuthin Memo, Ex. 5, Def.'s Mot. Summ. J., ECF No. 16-6 (sic throughout). Gardner opted to remain with Andersen Eye. She was given a position at the check-in desk, similar to her first position with Andersen Eye. Her hours were 8:30 a.m. to 5:00 p.m. daily except for Friday. She asked Mr. Beuthin if she could work a half day on Fridays which would give her less time in the office but also allow her to work the required thirty-six hours per week to retain full-time status and full-time benefits. Mr. Beuthin accommodated her request and allowed her to work half-days on Fridays.

### D.

In June of 2014, Gardner was experiencing significant pain in her lower legs and feet. On June 24, 2014, after treating with her physician, Gardner was restricted from returning to work. Gardner's doctor wrote her an off-work note that stated Gardner "is unable to work through July 25, 2014 due to medical restrictions. She will have follow up in 1 month and return to work or work restrictions will be determined at that time." June 24, 2014 Off-Work Note, Ex. 6, *id*., ECF No. 16-7. Gardner filled out an FMLA leave certification on July 7, 2014 for her leave that began on June 24, 2014. She listed the expected end date for her period of incapacity as July 24, 2014. *See* FMLA Certification, Ex. 7, *id*., ECF No. 16-8. She completed an Andersen Eye FMLA leave

request on July 10, 2014 that repeated this information. Gardner was placed on FMLA leave beginning June 24, 2014.

**E.**

On July 24, 2014, Gardner had a follow-up appointment with her treating physician. Her physician provided her another off-work note that stated Gardner "is unable to work through September 5, 2014." July 24, 2014 Off-Work Note, Ex. 12, *id.*, ECF No. 16-13. It further explained that Gardner would have a follow-up appointment the week of September 5, 2015 and "[f]urther restrictions will be determined at her . . . appointment that week." *Id*. Gardner's next appointment with her treating physician was on September 4, 2014. Following that visit, Gardner's physician once again provided her an off-work note. This note stated that "[s]he is unable to work for 1 month until her scheduled follow up on 10-2-14." Sept. 4, 2014 Off-Work Note, Ex. 13, *id.*, ECF No. 16-14.

Gardner's statutorily proscribed twelve weeks of FMLA leave were set to expire on September 16, 2014. Accordingly, Mr. Beuthin sent Gardner a letter on September 15, 2014 advising her of that fact. Additionally, he wrote that Andersen Eye was aware that she would be off work until at least October 2, 2014. He then advised Gardner that "Andersen Eye Associates does not have an extended leave of absence policy." Beuthin Letter, Ex. 14, *id.*, ECF No. 16-15. He did, however, note that "we want to work with you to ensure that all of your needs are satisfied while balancing our on-going need to serve our patients. Therefore, we will be holding your current check-out position for you until October 2, 2014." *Id*. Finally, he advised Gardner: "If you are not able to return to work on October 3, we will no longer be able to guarantee return to your current position and will need to reconsider your leave of absence status." *Id*.

A few days after this letter from Mr. Beuthin, Gardner reached out to Deb Rogers, the Andersen Eye employee who had initiated Gardner's return to Andersen Eye in 1999. Gardner described Deb Rogers as her "go-to person." Gardner Dep. 116, Ex. 2. At the time Gardner contacted her, Deb Rogers no longer worked for Andersen Eye. Ms. Rogers had not worked for Andersen Eye since earlier in 2014, before Gardner was moved to her new position. Gardner explained her situation to Ms. Rogers and sought her advice about potentially being unable to return to Andersen Eye on October 3, 2014. Ms. Rogers's response advised Gardner to seek legal representation and advised her: "Do NOT resign…..you can continue on Andersen disability for up to 26 weeks (6 months) regardless of FMLA status." Rogers Email, Ex. 3, *id*., ECF No. 16-4.[1]

On October 3, 2014, Gardner was unable to return to work. Her treating physician extended her off-work restriction to November 7, 2014. Upon learning of Gardner's continued inability to return to work, Andersen Eye terminated her employment effective October 10, 2014.

## II.

### A.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

---

[1] Andersen Eye's Employee Handbook does not detail any extended leave or medical leave policy. Mr. Beuthin, in his affidavit, explained that as a fringe benefit of full time employment with Andersen Eye, employees may acquire short-term disability insurance through Metropolitan Life Insurance Company. That short-term disability insurance lasts 26 weeks.

*Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**B.**

As a preliminary matter, it should be noted that Gardner did not file a response to Andersen Eye's motion for summary judgment. When a party moves for summary judgment and establishes the absence of evidence supporting the nonmoving party's case, "the party opposing the motion may not rely solely on the pleadings and must adduce more than a mere scintilla of evidence." *United States v. Totzkay*, 23 F. App'x 342, 344 (6th Cir. 2001) (quoting *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001)). The evidence adduced by the nonmoving party "need not be in a form that would be admissible at trial" but "the evidence cannot consist merely of allegations in the pleadings." *Spurlock v. Whitley*, 79 F. App'x 837, 839 (6th Cir. 2003) (internal quotation marks and citations omitted). In *Spurlock*, the Sixth Circuit explained the consequences of a nonmoving party not responding to a motion for summary judgment:

> Where no response to a summary judgment motion is properly before a district court, the court is under no duty to "search the entire record to establish that it is

> bereft of a genuine issue of material fact." Rather, the district court may rely upon the facts advanced by the movant. Federal Rule of Civil Procedure 56(e) requires that the nonmoving party's response designate specific facts demonstrating the existence of genuine issues of material fact. The nonmoving party is deemed to have waived its opportunity to designate facts in accordance with Rule 56(e) when it fails to properly file a response. This court has stated that it is not the role of the district court to develop facts for the nonmoving party.

*Id*. (internal citations omitted).

### III.

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from § 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Gardner pleads only a retaliation claim under the FMLA. The central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id*. (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). In other words, an employer's intent is relevant only in retaliation claims because those claims "impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id*. (citing *Edgar*, 443 F.3d at 508) (emphasis original).

> To establish a *prima facie* retaliation claim, a plaintiff must establish that:
>
> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was causal connection between the protected FMLA activity and the adverse employment action."[2]

---

[2] The Sixth Circuit "applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the FMLA." *Edgar v. JAC Products, Inc.* 443 F.3d 501, 508 (6th Cir. 2006) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001) and *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 933 (E.D. Mich. 2005)) (internal citations omitted).

*Killian*, 454 F.3d at 556 (citing *Arban*, 345 F.3d at 404). Defendant does not contest that Plaintiff engaged in protected FMLA activity; that it knew of that activity; and that Plaintiff suffered an adverse employment action. Defendant does contest Gardner's ability to prove that there was a causal connection between her protected activity and any adverse employment action she claims.

To satisfy the final prong of her prima facie case, Gardner must demonstrate a causal connection between her protected activity and the adverse employment actions she was subject to. Defendant asserts that Gardner cannot establish the final element of her prima facie case: that there was a causal connection between her FMLA leave and the adverse employment actions she was subject to. To satisfy this element, a plaintiff must present sufficient evidence to "raise [an] inference that her protected activity was the likely reason" for the adverse action. *Sosby v. Miller Brewing Co.*, 211 F. App'x 382, 387 (6th Cir. 2006) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990). However, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there [was] a causal connection between the retaliatory action and the protected activity." *Cutcher v. Kmart Corp.*, 364 F. App'x 183, 190 (6th Cir. 2010).

Here, Gardner claims that she suffered "an adverse employment action by virtue of Defendant's refusal to grant [her] an extended leave of absence that resulted in [her] termination of employment." Pl.'s Compl. ¶ 49, ECF No. 1. She further claims in her complaint that she is able to demonstrate a causal connection between the adverse employment action she suffered and her protected activity. She claims two causal connections:

> 51. That a causal connection is demonstrated, at least in part, by the suspicious timing between Plaintiff's protected activity and the adverse employment action.
>
> 52. That a causal connection is demonstrated, at least in part, by Defendant's failures to comply with its leave of absence and disability policies and denying Plaintiff an extension of her medical leave.

*Id.* at ¶¶ 51-52.

Andersen Eye has answered the claim that she was denied extended leave by explaining that it does not have such a policy. The company attached its employee handbook and an affidavit from its Chief Executive Officer Kurt Beuthin to its motion for summary judgment. Mr. Beuthin's affidavit states that "there is no 26-week extended leave policy" at Andersen Eye. Ex. 3 ¶ 14, Def.'s Mot. Summ. J., ECF No. 16-4. The employee handbook also does not reflect any extended leave policy, let alone one that is 26 weeks. *See* Ex. 15, *id.*, ECF No. 16-16. Indeed, Gardner testified in her deposition that her belief that Andersen Eye has a 26-week extended leave policy came from an email exchange she had with Deb Rogers, a former employee of Andersen Eye. Gardner Dep. 115-117, Ex. 2, *id.*, ECF No. 16-3. But Gardner admitted that she had no other basis for believing such a policy existed and also admitted that at the time Deb Rogers told her about the policy Ms. Rogers no longer worked for Andersen Eye. *Id.* When Gardner was asked if it was possible that Deb Rogers was actually thinking of the 26 weeks of disability insurance offered by Metropolitan Life Insurance Company, Gardner admitted that she did not know. *Id.* Additionally, in his affidavit, CEO Kurt Beuthin stated that Andersen Eye employees are entitled to short term disability insurance coverage through MetLife that lasts for 26 weeks. Ex. 3 ¶ 19, Def.'s Mot. Summ. J.

Gardner's complaint cites to *DeBoer v. Musashi Auto Parts*, 124 F. App'x 387 (6th Cir. 2005), in support of her claim that Andersen Eye's denial of extended leave establishes a causal connection between her protected activity and the adverse employment action she suffered. It does not. In *DeBoer*, the Sixth Circuit first concluded that the plaintiff, DeBoer, had established a prima facie case of discrimination because she was demoted one day after requesting FMLA paperwork. Only then did the Sixth Circuit move on to consider the fact that DeBoer's was

- 10 -

demoted without counseling, contrary to her employer's discipline policies. This, the Sixth Circuit concluded, combined with the temporal proximity between her demotion and her request for FMLA paperwork was sufficient to demonstrate that her employer's proffered non-discriminatory reason for demotion was pretextual. The Sixth Circuit said nothing about how non-compliance with internal policies relates to the causal nexus inquiry for establishing a prima facie case. In any event, that question is moot given the fact that Andersen Eye does not have an extended leave policy.

Since there is no evidence that Andersen Eye denied Gardner extended leave in violation of its own policy, Gardner can only rely on her termination as an adverse employment action.[3]

It is undisputed that at the end of Gardner's period of FMLA leave, she was medically unable to return to work. Indeed, Andersen Eye held her position open past the point her FMLA leave expired and until her next doctor's appointment following her leave period to see if she would be certified to return. She was not and Andersen Eye terminated her employment. "[A]n employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 506-07 (6th Cir. 2006) (citing *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784-85 (6th Cir. 1998)). *See also Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding that termination is not retaliatory under the FMLA where employee is unable to return to work at the end of statutory leave period). Because Gardner could not medically return to her job at the end of her period of FMLA leave, she cannot maintain an FMLA retaliation cause of action. Her FMLA claim will be dismissed.

---

[3] Because Andersen Eye does not have an extended leave policy it cannot be an adverse employment action to deny Gardner extended leave in violation of its policy, as Gardner contends.

**IV.**

Having concluded that Gardner's federal claim is to be dismissed, her claim under state law for violation of the Michigan Persons with Disabilities Civil Rights Act must now be addressed.

The Court has supplemental jurisdiction over these state law claims because they form part of the same controversy as Gardner's federal claim. *See* 28 U.S.C. § 1367(a). However, this Court may decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over the state law claims rests within the Court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). However, the dismissal of the claim over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Id*. at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The issues presented, which may more directly implicate Gardner's physical impairments than her use of FMLA leave, are more appropriate for resolution by a state court. Therefore, the Court declines

to exercise its supplemental jurisdiction. Gardner's supplemental state law claim will be dismissed without prejudice.

**V.**

Accordingly, it is **ORDERED** that Defendant Andersen Eye Associates, PLC's Motion for Summary Judgment, ECF No. 16, is **GRANTED in part**.

It is further **ORDERED** that Count I of Plaintiff Susan Gardner's Complaint, ECF No. 1, is **DISMISSED with prejudice**.

It is further **ORDERED** that Count II of Plaintiff Susan Gardner's Complaint, ECF No. 1, is **DISMISSED without prejudice**.

Dated: February 16, 2016                         s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 16, 2016.

                         s/Johnetta Curry
                         JOHNETTA CURRY
                         Acting Case Manager